*NOT FOR PUBLICATION*

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

FRANK EISENBAND, Individually and on Behalf of All Others Similarly Situated,

    Plaintiff,

v.

PINE BELT AUTOMOTIVE, INC. d/b/a PINE BELT NISSAN,

    Defendant.

Civil Action No. 17-8549 (FLW) (LHG)

OPINION

**WOLFSON, Chief Judge:**

Before the Court are a Motion for Summary Judgment filed by Defendant Pine Belt Automotive, Inc. d/b/a Pine Belt Nissan ("Defendant" or "Pine Belt") and a Cross-Motion for Sanctions and Partial Summary Judgment filed by Plaintiff Frank Eisenband ("Plaintiff").[1] On October 18, 2017, Plaintiff filed this putative class action against Defendant, bringing four counts for violation of the Telephone Consumer Protection Act ("TCPA") based on allegedly unauthorized text messages and calls from Defendant to Plaintiff.[2] In its Motion for Summary Judgment, Defendant argues that the computer program that was used to deliver these text

---

[1] Plaintiff also filed a Motion to Strike a declaration submitted by Defendant. At oral argument held on February 20, 2020, the Court denied Plaintiff's Motion to Strike. *See* Mot. Hr'g Tr. 5:20, Feb. 20, 2020.

[2] Plaintiff has since voluntarily dismissed two of these TCPA counts, which allege that Defendant violated the TCPA by contacting him while he had been registered on the national do-not-call list.

1

messages and calls did not meet the statutory definition of Automated Telephone Dialing System ("ATDS") and, therefore, Defendant cannot be liable under the TCPA. Plaintiff, in his Motion, contends that Defendant spoliated evidence by "destroying" the alleged ATDS when Defendant cancelled its agreement with a third-party software provider, CRMSuite, Inc ("CRMSuite"). Plaintiff also argues that he is entitled to summary judgment on one of Defendant's potential defenses to the TCPA claims: that Defendant had Plaintiff's consent to send the at-issue messages.

For the reasons that follow Defendant's Motion for Summary Judgment is **GRANTED** Plaintiff's Motion for Sanctions and Partial Summary Judgment is **DENIED**.

I.  **FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

Plaintiff first contacted Pine Belt in September 2017, by calling to request information about leasing a specific Nissan vehicle for possible pick-up the following day. Defendant's Statement of Undisputed Material Facts ("DSOF") at ¶¶ 8-18. After Defendant returned Plaintiff's call, it then followed up with several text messages to apprise him of special offers or promotions. *Id.* For instance, on September 25, 2017 at 11:03 am, Plaintiff received the following text message from Pine Belt:

> Pine Belt Nissan EXCLUSIVE private offer: This message can save you up to $500 on any previous Pine Belt Nissan quote. Come in, present this message to your sales representative and automatically save up to $500 off our best price. Visit us today at Pine Belt Nissan of Toms River to save big on all inventory. Offer expires on 9/29/2017.

*Id.* at ¶19.

Plaintiff claims that Pine Belt's messages violated the TCPA because they were sent using an ATDS, that is, a device has the capacity to store or produce telephone numbers to be called, using a random or sequential number generator. *See* 47 U.S.C. § 227(a)(1). Defendant

points to uncontroverted record evidence purportedly demonstrating that the CRMSuite computer platform, which Defendant used to send the subject text messages, did not meet the statutory definition of ATDS because Pine Belt employees, rather than the device itself, generated the numbers to be called or texted. For support, two Pine Belt representatives testified at depositions that the CRMSuite platform sent messages only to specifically selected persons from Pine Belt's own database. DSOF at ¶¶ 42-43. Second, screen shots of the actual text "campaigns" were printed from Pine Belt's computer platform's "Create Campaign" function, showing the various steps involved in the manual selection of customers and potential customers. *Id.* at ¶¶ 44-46. The "Create Campaign" function enabled Pine Belt to access its own cultivated contact data to create lists of customers and potential customers who might have been interested in learning of Nissan or Pine Belt promotions or special offers based upon their own prior inquiries to Pine Belt. *Id.* at ¶¶ 38-46. The CRMSuite platform required that a Pine Belt representative evaluate which of various filter mechanisms to apply in reaching the intended audience for the type of campaign, and then manually type the campaign title, campaign description and the actual content of the text message for each campaign. *Id.* at ¶¶ 45-46, 56-57.

Finally, CRMSuite's CEO, Richard Latman, who designed and created the platform, testified at his deposition and submitted a declaration attesting that the platform did not have the capacity to generate random or sequential telephone numbers and then dial those numbers.[3] *Id.* at

---

[3] In his Motion to Strike, Plaintiff argued that Defendant was not competent to testify as to the platform's functioning because he only coded 10 to 15 percent of platform himself. However, as I noted at oral argument, that Latman might have collaborated with others in coding the platform does not speak to his competence to testify. He is the company's CEO and was the platform's architect, and, as a result, was intimately familiar with how the platform operated. This background more than sufficiently qualifies him to attest to CRMSuite's functioning. *See* Mot. Hr'g Tr. 35:23–36:11, Feb. 20, 2020.

¶ 51. In fact, according to Latman, there was no line of computer code that used the randomizing or "RAND function." *Id.* at ¶ 52. Rather, messages could only be sent to specifically targeted customers or potential customers within Pine Belt's CRM database and then only to those who "qualified" as recipients by meeting the message criteria specified by the creator of the particular campaign. *Id.* at ¶¶ 52-58. In sum, Mr. Latman explained that, far from being an automated system, "[t]he platform doesn't do anything automatically:" "Every single piece of this campaign, including the category, the category list has to be created by the dealership, as does the campaign title, the campaign description, the date ranges, everything is manual, even the description." *Id.* at ¶ 56.

On October 18, 2017, less than four weeks after he initiated communications with Pine Belt, Plaintiff filed the present TCPA Class Action Complaint against Defendant seeking statutory damages of $1,500 for each alleged TCPA violation. Compl. p. 13, Prayer for Relief, ¶¶ B-E. After engaging in discovery, Defendant filed the present Motion for Summary Judgment on August 19, 2019, and, on September 27, 2019, Plaintiff filed his Motion for Sanctions and Partial Summary Judgment. On February 20, 2020, the Court heard oral argument on these motions.

In the present motions, Plaintiff does not contest any facts regarding the operation of the CRMSuite platform and how the dialed numbers are selected by Pine Belt initially. Instead, he argues that Defendant engaged in spoliation by canceling its agreement with CRMSuite, and not providing Plaintiff advance notice of such cancellation, thereby depriving Plaintiff of the evidence that might demonstrate the system actually does function as an ATDS. He alternatively argues that, even accepting the facts as Defendant presents them, the platform meets the

4

definition of ATDS, as defined by Federal Communications Commission ("FCC") orders and case law.

## II. LEGAL STANDARD

Summary judgment is appropriate where the Court is satisfied that "there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." *Fed. R. Civ. P.* 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). A factual dispute is genuine only if there is "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party," and it is material only if it has the ability to "affect the outcome of the suit under governing law." *Kaucher v. County of Bucks,* 455 F.3d 418, 423 (3d Cir. 2006); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. *Anderson,* 477 U.S. at 248. "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor .'" *Marino v. Indus. Crating Co.,* 358 F.3d 241, 247 (3d Cir. 2004) (*quoting Anderson,* 447 U.S. at 255)); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *Curley v. Klem,* 298 F.3d 271, 276–77 (3d Cir. 2002).

The burden of establishing that no "genuine issue" exists is on the party moving for summary judgment. *Celotex,* 477 U.S. at 330. "A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial." *Gleason v. Norwest Mortg., Inc.,* 243 F.3d 130, 138 (3d Cir. 2001). The non-moving party must present "more than a scintilla of evidence showing that there is a genuine issue for trial."

*Woloszyn v. County of Lawrence,* 396 F.3d 314, 319 (3d Cir. 2005) (quotations omitted). Under *Anderson,* plaintiffs' proffered evidence must be sufficient to meet the substantive evidentiary standard the jury would have to use at trial. 477 U.S. at 255. To do so, the non-moving party must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex,* 477 U.S. at 324 (quotations omitted); *see also Matsushita,* 475 U.S. at 586; *Ridgewood Bd. of Ed. v. Stokley,* 172 F.3d 238, 252 (3d Cir. 1999). In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson,* 477 U.S. at 249. Credibility determinations are the province of the factfinder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir. 1992).

There can be "no genuine issue as to any material fact," however, if a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322–23. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323; *Katz v. Aetna Cas. & Sur. Co.,* 972 F.2d 53, 55 (3d Cir.1992).

### III. <u>DISCUSSION</u>

Defendant's motion turns on a question of law. Defendant contends that, to qualify as an ATDS, a system must have the capacity to randomly or sequentially generate numbers without human intervention, while Plaintiff argues that an ATDS must only dial numbers without human intervention, even if those numbers were preprogrammed by humans. Importantly, Plaintiff does

6

not present any evidence to show that the CRMSuite platform had the capacity to randomly or sequentially generate numbers. Because I agree with Defendant, I find that, as a matter of law, the CRMSuite platform does not qualify as an ATDS and, therefore, Defendant cannot be held liable under the TCPA.

In apparent recognition of the legal hurdles facing his case, Plaintiff moves for sanctions, arguing that Defendant engaged in spoliation by canceling its contract with CRMSuite, thereby making it impossible for Plaintiff to conduct an expert examination of the platform to determine whether it had the requisite capacity to randomly generate numbers. However, because the CRMSuite platform was not in Defendant's custody or control and because Plaintiff has not shown prejudice, Plaintiff's sanctions motion fails. Below is my reasoning.

**A.    Motion for Summary Judgment: Whether the CRMSuite Platform is an ATDS**

The TCPA provides that it is "unlawful for any person within the United States . . . to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system . . . to any telephone number assigned to a . . . cellular telephone service." 47 U.S.C. § 227(b)(1)(A)(iii). "A text message to a cellular telephone, it is undisputed, qualifies as a 'call' within the compass of § 227(b)(1)(A)(iii)." *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 667 (2016); *see also Gager v. Dell Financial Services, LLC*, 727 F.3d 265, 269 n.2 (3d Cir. 2013). "The term 'automatic telephone dialing system' means equipment which has the capacity–(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1).

The FCC has regulatory authority under the TCPA. 47 U.S.C. § 227(b)(2). Relevant here, the FCC has exercised this authority to address the statutory definition of the term "automatic telephone dialing system" on four occasions. *See Wilson v. Quest Diagnostics Inc.*, No. 18-11960, 2018 WL 6600096, at *2 (D.N.J. Dec. 17, 2018) (summarizing the rulings). They were: *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 FCC Rcd. 14014, 14093 ¶ 133 (2003) (the "2003 Order") (predictive dialers, i.e. equipment that can make calls from lists of phone numbers without human intervention, are ATDSs); *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 23 FCC Rcd. 559, 566 ¶ 12 (2008) (the "2008 Order") (affirming the 2003 Order); *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 27 FCC Rcd. 15391, 15392 ¶ 2 n.5 (2012) (the "2012 Order") ("any equipment that has the specified *capacity* to generate numbers and dial them without human intervention regardless of whether the numbers called are randomly or sequentially generated or come from calling lists" is an ATDS (citing the 2003 Order)); and *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 30 FCC Rcd. 7961, 7974 ¶ 16 (2015) (the "2015 Order") ("capacity" within § 227(a)(1) includes not only "present ability" but also "potential functionality"). However, the D.C. Circuit set aside the portion of the 2015 Order that addressed the definition of an ATDS, because it found that the FCC's definition was arbitrary and capricious by categorizing all smartphones as ATDSs and thus would subject most Americans to liability under the TCPA. *ACA International v. FCC*, 885 F.3d 687, 698-99 (D.C. Cir. 2018).

After *ACA International*, the Third Circuit decided *Dominguez on Behalf of Himself v. Yahoo, Inc.*, 894 F.3d 116 (3d Cir. 2018), which involved a plaintiff who had acquired a

telephone number that had previously belonged to a person who had subscribed to receive a text message alert for each email received by that person's Yahoo account. *Id.* at 117. The Third Circuit affirmed the district court's grant of summary judgment to Yahoo, even though the plaintiff had received over 27,000 text messages from Yahoo, holding that, in order violate the TCPA, a device must have the "present capacity to function as an [ATDS] by generating random or sequential telephone numbers and dialing those numbers." *Id.* at 121 (emphasis added).

Following these cases, a split has arisen among lower courts regarding the meaning of the definition of ATDS, and specifically, the meaning of "generating random or sequential telephone numbers." A threshold issue to interpreting that language is whether *ACA International* invalidated not just the 2015 Order, but also the 2003 and 2008 Orders, which had interpreted the statute to cover devices similar to the one at issue here: "predictive dialers," *i.e.,* "dialing systems that 'store pre-programmed numbers or receive numbers from a computer database and then dial those numbers in a manner that maximizes efficiencies for call.'" *Dominguez v. Yahoo!, Inc.*, 2017 WL 390267, at 4 (E.D. Pa. Jan. 27, 2017).

I find that *ACA International* did, in fact, invalidate those orders. In *ACA International*, the FCC argued that the petitioners could not challenge the 2015 Order, given its similarities with the 2003 and 2008 Orders, which had not been timely appealed. The court disagreed, noting that the 2015 Order "essentially ratifies the previous ones," and concluding that "[w]hile the Commission's latest ruling purports to reaffirm the prior orders, that does not shield the agency's pertinent pronouncements from review," as fatal inconsistencies and ambiguities in all of the orders "left significant uncertainty about the precise functions an autodialer must have the capacity to perform." *ACA Int'l*, 885 F.3d at 701. Thus, in invalidating the 2015 Order, *ACA's*

9

ruling "also covered the agency's 'pertinent pronouncements'—its prior Orders." *Gadelhak v. AT&T Servs., Inc.*, No. 19-1738, 2020 WL 808270, at *3 (7th Cir. Feb. 19, 2020).

Numerous courts have concurred with this assessment. *See Gadelhak., Inc.*, 2020 WL 808270, at *3; *Glasser v. Hilton Grand Vacations Co.*, 948 F.3d 1301, 1310 (11th Cir. 2020); *Marks v. Crunch San Diego, LLC*, 904 F.3d 1041, 1049–50 (9th Cir. 2018); *see also Dominguez v. Yahoo, Inc.*, 894 F.3d 116, 119 (3d Cir. 2018) (implicitly reaching the same conclusion by declining to defer to any FCC Order); *Fleming v. Associated Credit Servs.*, 342 F.Supp.3d 563, 574 (D.N.J. 2018); *Johnson v. Comodo Grp., Inc.*, No. 16-4469, 2020 WL 525898, at *6 (D.N.J. Jan. 31, 2020); *Collins v. Nat'l Student Loan Program*, 360 F. Supp. 3d 268, 272 (D.N.J. 2018); *Richardson v. Verde Energy USA*, Inc., 354 F. Supp. 3d 639, 648 (E.D. Pa. 2018).[4]

Because I find that *ACA International* and *Dominguez* invalidated the 2003 and 2008 Orders, it must be decided, in the first instance, without the guidance of the FCC, whether computer programs like the one here qualify as an ATDS under the statutory language. *See Fleming*, 342 F. Supp. at 576. ("In light of that invalidation, I lack a binding agency determination as to whether predictive dialers that dial numbers from a list qualify as an ATDS. I must therefore look to the statute and its language to make an independent determination as to whether such systems are disallowed under the TCPA."). The statute defines an ATDS as "equipment which has the capacity–(A) to store or produce telephone numbers to be called,

---

[4] *But see Wilson*, 2018 WL 6600096, at *3 ("[T]he court in *ACA International* only struck down the *expanded interpretation* in the 2015 Order as unreasonable," (emphasis in original) so predicative dialers are still ATDSs under binding precedent.).

10

using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1). Courts are split on whether this language encompasses systems that dial numbers randomly or sequentially even if those numbers were preprogrammed by humans, or whether the system must actually generate the numbers randomly or sequentially without human intervention.

The majority of courts, including the majority of the Courts of Appeals, have held that the statutory language "applies to the manner in which the numbers make their way onto the list—not to the manner in which the numbers are dialed once they are on the list." *Fleming*, 342 F. Supp. 3d at 576.[5] Because reading the statute otherwise would require mangling its plain language, I agree. Indeed, under subsection (a) of the statute, an ATDS must "us[e] a random or sequential number generator" only to "store or produce telephone numbers *to be called*"—that is, numbers that have not yet been dialed. Under subsection (b) of the statute, however, there is no requirement that an ATDS use a random or sequential number generator to actually "dial such numbers." It follows, then, an ATDS *must* randomly or sequentially produce and store numbers, though it does not need to dial them randomly or sequentially. Moreover, construing the statute as Plaintiff desires would render the phrase "using a random or sequential number generator" nearly meaningless. As another court has put it:

> [b]ecause the phrase 'using a random or sequential number generator' refers to the kinds of 'telephone numbers to be called' that an ATDS must have the capacity to store or produce, it follows that that phrase is best understood to describe the process by which those numbers are generated in the first place....

---

[5] A handful of courts have found the statutory language ambiguous, and, consequently, have looked to statutory purpose and legislative intent, and found that the TPCA prohibits unsolicited calls from devices that dial random or sequential numbers, even if those numbers were preprogrammed by humans. *See Marks*, 904 F.3d at 1049; *Johnson,* 2020 WL 525898, at *6 (D.N.J. Jan. 31, 2020).

11

> As a result, were the phrase 'using a random or sequential number generator' understood to refer to how numbers are called rather than to how they are generated, it would be superfluous, as it would simply encompass the universe of possible orders in which numbers could be dialed [from a set list].

*Fleming,* 342 F. Supp. 3d at 576 (quoting *Pinkus v. Sirius XM Radio, Inc.*, 319 F. Supp. 3d 927, 934 (N.D. Ill. 2018)).; *see also Gadelhak,* 2020 WL 808270, at *1; *Glasser v. Hilton Grand Vacations Co.*, 948 F.3d 1301, 1311 (11th Cir. 2020). *see also Collins*, 360 F. Supp. 3d at 272.[6] Thus, to qualify as an ATDS, a system must randomly or sequentially generate numbers, and, accordingly, any system that dials numbers from a preprogrammed list does not fall within the statutory definition.

Here, the CRMSuite platform is not an ATDS because, according to the uncontroverted evidence, the platform did not have the present capacity to randomly or sequentially generate numbers. The deposition testimony from Pine Belt employees who operated the CRMSuite platform, the testimony of the person who designed and created the software service (Latman), and documents printed from the CRMSuite platform, all demonstrate that the number generation process was, in no way, random or sequential. DSOF at ¶¶ 36-46, 51-56. Rather, messages could only be sent to specifically targeted customers or potential customers within Pine Belt's CRM database and then only to those who "qualified" as recipients by meeting the message criteria specified by the creator of the particular campaign. *Id.* at ¶¶ 52-58. Courts have repeatedly found

---

[6] The Third Circuit did address the issue in *Dominguez v. Yahoo, Inc.*, 629 F. App'x 369, 371-72 (3d Cir. 2015)—a prior appeal in the *Dominguez* case discussed *supra*—and seemed to reach the same conclusion as these courts, finding that "random or sequential" number generation refers to the numbers themselves rather than the manner in which they are dialed. However, this opinion was non-precedential and purportedly relied upon the 2015 Order's definition of an ATDS, which was overruled in *ACA International*, so it provides some guidance. It is, indeed, suggestive of how the Third Circuit would approach this issue should it again be confronted with it.

that similar systems do not meet the statutory definition of an ATDS. *See, e.g., Gaza v. Auto Glass America, LLC*, No. 17-CV-1811-T-27, 2018 WL 5775915 *4 (M.D. Fla. Nov. 2, 2018) (summary judgment granted where "[d]efendant's representative creates and uploads a list to an online 'platform' from which customer names and phone numbers are selected, text messages drafted, a date and time of delivery is selected, and the 'send' button is pressed, all requiring human intervention."); *Herrick v. GoDaddy.com LLC*, 312 F. Supp. 3d 792, 801-03 (D. Ariz. 2018) (the 3Seventy Platform was not an ATDS because it required an employee to navigate to website, log on to platform, select customer numbers to receive text message, draft message, select time and date to send, and enter a "captcha" to show human authorization); *Duran v. La Boom Disco, Inc.*, 369 F. Supp. 3d 476, 492 (E.D.N.Y. 2019) (summary judgment granted even where court relied on 2003 and 2008 FCC orders, "because a user determines the time at which the [text] programs send messages to recipients, they operate with too much human involvement to meet the definition of an autodialer); *Ramos v. Hopele of Fort Lauderdale, LLC*, 334 F.Supp.3d 1262, 1265 (S.D. Fla. Sept. 20, 2018) (summary judgment granted where texting platform could only send messages to specifically identified numbers that have been input into the system, and required user to sign in, create list of customer phone numbers based upon various criteria, write the content of the message, select the date and time of delivery, and press send; platform "could not send the text messages at issue without a significant amount of human involvement"; "Snyder's testimony is insufficient to create an issue of material fact.").[7]

---

[7] It should be noted that the CRMSuite platform would likely not qualify as an ATDS even under the 2003 and 2008 Orders because it requires significantly more human intervention to dial numbers than with an autodialer. Unlike an autodialer, which automatedly dials numbers from preprogrammed lists in order to maximize efficiencies, the CRMSuite platform requires the manual selection of call recipients through a detailed, multi-step process.

Thus, because, based on the uncontroverted evidence, the CRMSuite platform does not meet the statutory definition of an ATDS, summary judgment in Defendant's favor is appropriate.[8]

B.     **Motion for Sanctions: Spoliation**

Having failed to put forth any evidence that the system is an ATDS, Plaintiff argues that Defendant engaged in spoliation by canceling its contract with CRMSuite, thereby destroying any evidence through which he might have been able to examine how the system actually operates. In that regard, Plaintiff contends that while the record evidence might indicate that CRMSuite only had the capacity to dial numbers from a stored list, the platform might have included an unused number generation function.

In law, spoliation refers to "'the hiding or destroying of litigation evidence, generally by an adverse party.'" *Williams v. BASF Catalysts LLC*, 765 F.3d 306, 320 (3d Cir. 2014) (quoting *Rosenblit v. Zimmerman*, 166 N.J. 391 (2001)); *Bull v. United Parcel Serv., Inc.*, 665 F.3d 68, 73 (3d Cir. 2012) (finding that spoliation occurs in "situations where a party has altered, destroyed, or failed to produce evidence relevant to an issue in a case.") (quoting *Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 334 (3d Cir. 1995)). To deter such conduct, spoliation sanctions are imposed to punish the wrongdoer for destroying evidence. *See Williams*, 765 F.3d at 320.

This motion is governed by Fed. R. Civ. P. 37(e) which addresses the failure to preserve electronically stored information ("ESI") and what and when spoliation sanctions may be imposed.[9] The relevant provision of Rule 37 was amended in 2015 to state that a court may

---

[8] Because the system is not ATDS and Defendant cannot be liable under the TCPA, Plaintiff's motion for partial summary judgment on the consent issue is moot and is, therefore, denied.
[9] Plaintiff argues that their spoliation motion should be decided under this Court's inherent authority, rather than Rule 37(e), because the software program does not constitute ESI. While true that Rule 37 does not define ESI, Plaintiff has cited no case law suggesting how a computer

impose sanctions "[i]f electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery." Fed. R. Civ. P. 37(e). If the court finds prejudice to the other party from such "loss," it may "order measures no greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(e)(1). A court may impose more severe sanctions "only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation." Fed. R. Civ. P. 37(e)(2); *see generally CAT3, LLC v. Black Lineage, Inc.*, 164 F. Supp. 3d 488, 495-96 (S.D.N.Y. 2016) (discussing the amended Rule 37(e)). Before reaching this analysis, however, the Court must determine whether spoliation has, in fact, occurred. *See Bull v. United Parcel Serv., Inc.*, 665 F.3d 68, 74 n. 5 (3d Cir. 2012) (drawing a distinction between analysis of spoliation and of spoliation sanctions). Spoliation occurs where "the evidence was in the party's control; the evidence is relevant to the claims or defenses in the case; there has been actual suppression or withholding of evidence; and, the duty to preserve the evidence was reasonably foreseeable to the party." *Id.* at 73 (citing *Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 334 (3d Cir.1995)).

Plaintiff's motion is premised upon the claim that Pine Belt intentionally "destroyed" the CRMSuite platform because Pine Belt canceled its technology vendor agreement with CRMSuite. Plaintiff argues that Defendant terminated its agreement with CRMSuite and switched its text messaging platform months after the filing of the Complaint. The alleged

---

program might be viewed as physical evidence rather than ESI. Courts dealing with the issue have, in fact, viewed computer programs as ESI. *See, e.g. 4DD Holdings, LLC v. United States*, 143 Fed. Cl. 118, 131 (2019) (noting that software constitutes ESI for Rule 37 purposes).

15

spoliation purportedly "made it impossible for Plaintiff's expert [Randall Snyder] to test his [ATDS] hypothesis" because the expert "was prevented from inspecting the functionalities of the platform as it existed in 2017" (*i.e.*, "on the dates it was used by Defendant"), which Plaintiff claims is "essential to Plaintiff proving his claim." ECF No. 30-1 at 13-14, 16; ECF No. 32 at 2. In response, Defendant contends that, under the CRMSuite Services Agreement, Pine Belt did not own or control the CRMSuite technology platform, and that they produced a reasonable substitute in the form of printed screenshots of the CRMSuite platform's "Create Campaign" function for the 2017 text campaigns at issue.

As an initial matter, a party may only "lose" documents or ESI within that party's "possession, custody, or control." *See Camden Iron & Metal, Inc. v. Marubeni Am. Corp.,* 138 F.R.D. 438, 442 (3d Cir. 1991). "[T]his includes documents that are not necessarily in the party's physical possession" and "a litigation hold may extend to third parties" over which the primary litigant has control. *Haskins v. First Am. Title Ins. Co.*, No. 10-5044, 2012 WL 5183908, at *4 (D.N.J. Oct. 18, 2012). "It has been well established that the test for control is not defined as mere possession, but as the legal right to obtain such documents on demand." *Swindell Dressler Int'l Co. v. Travelers Cas. & Sur. Co.*, 827 F. Supp. 2d 498, 505 (W.D. Pa. 2011) (citing *Tequila Centinela, S.A. de C.V. v. Bacardi & Co. Ltd.,* 242 F.R.D. 1, 8–9 (D.D.C.2007)) (citing *Alexander v. FBI,* 194 F.R.D. 299, 304 (D.D.C.2000)); *see also Mercy Catholic Med. Ctr. v. Thompson,* 380 F.3d 142, 160 (3d Cir. 2004).

Here, nothing in the record indicates that Defendant had control over the CRMSuite platform. CRMSuite is not packaged software with "versions" that are downloaded, but is instead an internet-based customer relationship management tool that Defendant could only

access through the web. *See* McDonald Decl., Ex. J at 27:14-18. CRMSuite owns and controls the platform technology, and Pine Belt was a user in accordance with the CRMSuite Services Agreement, and the record does not suggest that Defendant ever had the legal right to demand the type of access to the platform that Plaintiff seeks, including access to the source code and other technical details. *See* McDonald Decl., Ex. G (CRMSuite Services Agreement) at 6 ("[T]he systems used to house [your] data is ours not yours"). Further highlighting this lack of control, is that, according to the uncontroverted testimony of Latman, CRMSuite's CEO, the platform was constantly changing, a process that was directed by CRMSuite and that Defendant was unable to influence. Indeed, according to Latman, "[t]he platform is constantly evolving with changes occurring daily, and there could be as many as 1,500 changes per year." *See* McDonald Decl., Exhibit J at 28:13-18. As Latman attested, what existed in the platform "even yesterday would be overwritten if any changes in the platform were implemented today." Latman Decl. at ¶ 7. Defendant simply cannot be said to have had "control" over the platform when it was constantly being altered without Defendant's consent or influence. Thus, Plaintiff has not carried his burden of demonstrating that Defendant lost ESI over which it had custody or control. *See Wyatt Tech. Corp. v. Malvern Instruments Inc.*, 526 F. App'x 761, 763 (9th Cir. 2013) (refusing to impose spoliation sanction where plaintiff had not provided evidence that defendant had custody or control over third-party software's source code).

Plaintiff relies heavily on *Klett v. Green*, in which this Court imposed spoliation sanctions on a plaintiff in a negligence suit against a postal truck driver involved in a car accident, for allowing the vehicle involved in the crash to be destroyed. *Klett v. Green*, 10-02091, 2012 WL 2476368, at *9 (D.N.J. June 27, 2012). There, the Court ruled that, although

the plaintiff was not in physical possession of the vehicle at the time it was destroyed, there was "no evidence that Plaintiff relinquished ownership, and thus control, of the vehicle prior to filing suit," and, "[a]s a result, the vehicle was under Plaintiff's control, insofar as she had access to and ownership of it." 2012 WL 2476368 (D.N.J.). Setting aside that Defendant here, unlike in *Klett*, never owned the CRMSuite platform, relying on a case involving the destruction of physical evidence is entirely inapposite. Unlike in *Klett*, the evidence at issue is not a static piece of physical evidence over which Defendant had full dominion. Rather, it is a dynamic, constantly evolving computer program that Defendant was powerless to control.

Moreover, even if Defendant were in custody or control of the software, Plaintiff has not demonstrated prejudice, as is required to impose sanctions under Rule 37(e). As an initial matter, because the platform was "constantly evolving," it seems unlikely that that the version of the platform that Defendant allegedly spoliated was the same version that Defendant used to send the messages that are the subject of this lawsuit. *See, e.g., Saller v. QVC, Inc.,* No. 15-cv-2279, 2016 WL 4063411, at *5 (E.D. Penn. July 29, 2016) (failure to uncover documents not the result of failure to preserve where normal operation of overwriting made it uncertain that information existed when action commenced). Indeed, despite knowing that the platform was digital and, therefore, mutable, Plaintiff waited months to seek an inspection of the software, and, importantly, never issued a third-party subpoena to CRMSuite at the time of filing the lawsuit, at the earliest. *See Wal-Mart Stores, Inc. v. Cuker Interactive,* LLC, No. 14-cv-5264, 2017 WL 239341, at *1 (W.D. Ark. Jan. 19, 2017) (refusing to sanction non-movants when evidence could have been available, but was not pursued by the moving party). Moreover, although Plaintiff's expert Randall Snyder declared that, with only the evidence provided, "it would be impossible to analyze and determine how the overall automatic text message system operates," Snyder Decl. at

18

¶¶ 17-18, he offers no specifics about what an onsite inspection or any additional evidence might show. In fact, Defendant cites numerous TCPA cases in which Snyder testified as an expert where personal onsite inspection of a software system and equipment was not required.[10] Plaintiff's arguments amount to mere speculation, which is insufficient for a finding of prejudice. *See CIGNEX Datamatics, Inc. v. Lam Research Corp.*, No. CV 17-320 (MN), 2019 WL 1118099, at *5 (D. Del. Mar. 11, 2019) ("[t]he Court concludes that there is insufficient evidence [for a finding of prejudice]. Lam's suggestion as to the potential contents of the lost emails appears to be speculation."). Thus, Plaintiff's Motion for Sanctions is denied.[11]

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is **GRANTED** and Plaintiff's Motion for Sanctions and Partial Summary Judgment is **DENIED**. Plaintiff's claims are, therefore, **DISMISSED**, and the case shall be marked **CLOSED.**

---

[10] Notably, in *Dominguez on Behalf of Himself v. Yahoo, Inc.*, 894 F.3d 116 (3d Cir. 2018), the Third Circuit upheld the District Court's decision to exclude Snyder's expert opinion because he failed to offer "any explanation of how the Email SMS System actually did or could generate random telephone numbers to dial" and did "not shed light on the key factual question actually at issue in this case—whether the Email SMS System functioned as an autodialer by randomly or sequentially generating telephone numbers, and dialing those numbers." *Id.* at 120–21.

[11] Plaintiff has also not demonstrated that Defendant acted with intent in failing to preserve the software. In that regard, Plaintiff only offers bald, unsupported assertions, including that Defendant somehow "hid" the platform change. Without any shred of evidence of Defendant's motivation, however, the Court cannot impose the most severe sanctions against Defendant. *See e.g., Goldrich v. City of Jersey City*, 2018 WL 4492931, at *11 (D.N.J. Jul. 25, 2018) ("[T]he Court declines to speculate that plaintiff intentionally deprived defendants of the evidence."); *Fuhs v. McLachlan Drilling Co.*, No. 16-376, 2018 WL 5312760, at *14 (W.D. Pa. Oct. 26, 2018) (refusing to impose severe sanctions under Rule 37 when the defendant "ask[ed] the Court to draw speculative inferences about the Plaintiffs' subjective intent").

Dated: March 27, 2020              /s/ Freda L. Wolfson
                                   Hon. Freda L. Wolfson
                                   United States Chief District Judge